**Re ARMCO INC. and Armco Financial Holdings Corporation**

v.

**GLENFED FINANCIAL CORPORATION.**

Civ. A. No. 87–5085.

United States District Court, D. New Jersey.

Aug. 8, 1989.

Andrew T. Berry, Gita F. Rothschild, Kenneth R. Auerbach, McCarter & English, Newark, N.J., for plaintiffs.

Ronald M. Sturtz, Sheldon M. Finkelstein, Brad R. Roth, Hannoch Weisman, Roseland, N.J., for defendant.

## OPINION AND ORDER

LECHNER, District Judge.

### Introduction

This matter involves three separate motions (two of which include cross-motions) for partial summary judgment in a substantial contract dispute arising in the two years after the closing of an acquisition transaction.[1] Because of the size and com-

---

**1.** The several briefs setting forth the parties' positions on the three motions, referred to throughout this opinion, are identified as follows: Plaintiffs' Report on the Income Tax Issues, dated January 10, 1989 ("Plaintiffs' First Brief"); Plaintiffs' Memorandum of Law in Support of their Cross–Motion for Partial Summary Judgment on the Tax Benefit Issue, dated June 23, 1989 ("Plaintiffs' Second Brief"); Plaintiffs' Memorandum of Law in Support of their Cross–Motion for Summary Judgment (Deferred Income) and in Opposition to Defendant's Motion for Partial Summary Judgment (Aircraft Agreement), dated June 9, 1989 ("Plaintiffs' Third Brief"); Plaintiffs' Memorandum of Law in Support of their Cross–Motion for Partial Summary Judgment on Count V of the Complaint, dated June 9, 1989 ("Plaintiffs' Fourth Brief"); Defendant's Report on Tax Benefit Issues, dated May 23, 1989 ("Defendant's First Brief"); Defendant's Memorandum in Support of Motion for Partial Summary Judgment (Tax Issue), dated June 22, 1989 ("Defendant's Second Brief"); Defendant's Memorandum in Support of Motion for Partial Summary Judgment (Aircraft Agreement), dated May 25, 1989 ("Defendant's Third Brief"); Defendant's Reply Memorandum in Support of Motion for Partial Summary Judgment (Aircraft Agreement), and in Opposition to Plaintiffs' Cross–Motions for Partial Summary Judgment (Deferred Income and Count V—Commissions), dated June 22, 1989 ("Defendant's Fourth Brief").

plexity of this case, the parties have agreed to present, to the extent possible, various discrete issues for disposition by way of summary judgments and limited evidentiary hearings. The disposition of the present motions will not end this lawsuit.

By way of further introduction to the disputes occasioning the present motions, in late 1984, plaintiff Armco, Inc. ("Armco")[2] agreed to sell its financial services subsidiary, Armco Financial Corporation ("AFC"), to Glendale Federal Savings and Loan Association ("Glendale"). The sale was completed by way of a forward merger of AFC into a newly created subsidiary of Glendale, defendant Glenfed Financial Corporation ("Glenfed"), pursuant to the terms of an Agreement and Plan of Merger and Liquidation (the "Merger Agreement") executed by the parties to this litigation, among others, on April 10, 1985. The purchase price for the acquisition was $77 million, $20 million of which was to be paid in the form of a Subordinated Promissory Note (the "Note").

Plaintiffs contend the purchase price was intended to be based on the approximate "book value" (assets minus liabilities) of AFC. Plaintiffs' Third Brief, p. 2. The main business of AFC was secured commercial lending to small to mid-size companies. Glenfed conducts the same type of lending as its predecessor, AFC—having assumed control of AFC's loan portfolio, staff and offices as of April, 1985.

The most significant motion and cross-motion, from a dollar point of view, involve an interpretation of the words "realized tax benefits" contained in the Merger Agreement. In short, this motion (the "Tax Motion") requires a determination of whether certain events gave rise to "realized tax benefits" in favor of the defendant within the meaning of the Merger Agreement. For the reasons set forth below, partial summary judgment on the Tax Motion is granted in favor of Glenfed.

A second substantial motion and cross-motion (the "Deferred Income Motion")

seek a determination of the amount of certain revenues, derived from various aircraft loan, lease and other accounts acquired by Glenfed, which Glenfed must share with the plaintiffs pursuant to a sharing formula set forth in a collateral agreement (the "Aircraft Agreement"). Because an exhibit to the Aircraft Agreement contains a material ambiguity—indeed a discrepancy concerning a key dollar figure to be "plugged into" the sharing formula—and because an adequate determination of the appropriate figure to be included in the calculation would require a resolution of disputed material facts, the Aircraft Motion for summary disposition is denied.

The third motion for partial summary judgment is brought by plaintiffs and concerns their asserted entitlement, under the Aircraft Agreement, to have the amount of sharable proceeds from the aircraft portfolio reduced *only* by commissions which were actually paid (in the sense of a disbursement) by Glenfed to National Union (defined below) (the "Commissions Motion"). The Commissions Motion is denied for the reasons set forth below.

Discussion

*Summary Judgment Standard*

To prevail on a motion for summary judgment, the moving party must establish "there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The district court's task is to determine whether disputed issues of fact exist, but the court cannot resolve factual disputes in a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). All evidence submitted must be viewed in a light most favorable to the party opposing the motion. *See Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

---

**2.** Plaintiffs Armco and Armco Financial Holdings Corporation (a subsidiary of Armco and the former parent company of Armco Financial

Corporation—the predecessor of defendant Glenfed Financial Corporation) are sometimes referred to collectively as "plaintiffs."

Although the summary judgment hurdle is a difficult one to overcome, it is by no means insurmountable. As the Supreme Court has stated, once the party seeking summary judgment has pointed out to the court the absence of a fact issue,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.' ... Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'

*Matsushita,* 475 U.S. at 586–87, 106 S.Ct. at 1355–56 (emphasis in original, citations and footnotes omitted).

The Court elaborated in *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11 (citations omitted): "If the evidence [submitted by a party opposing summary judgment] is merely colorable ... or is not significantly probative ... summary judgment may be granted." The Supreme Court went on to note in *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986) (footnote omitted): "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." Thus, once a case has been made in support of summary judgment, the party opposing the motion has the affirmative burden of coming forward with *specific* facts evidencing a need for trial. *See* Fed.R.Civ.P. 56(e).

The parties appear to agree that California law applies to this dispute. Indeed, Section 9 of the Aircraft Agreement states:

> 9. *Disputes.* This agreement shall be construed and enforced in accordance with the laws of the State of California.[3]

*Id.* The parties have cited to New Jersey authorities as well, in case it was concluded that New Jersey has a significant interest in having its law applied to this matter, notwithstanding the language of the Aircraft Agreement. Because of Section 9 of the Aircraft Agreement, this matter will be decided under the law of California. As the parties point out, however, the key legal principles appear to be largely the same under the law in New Jersey and California.

## I. The Tax Motion

Both parties agree the dispute raised in the Tax Motion is purely legal and that summary judgment on this issue is appropriate. In summary, when Armco sold AFC to the parent company of Glenfed, it agreed under the terms of the Merger Agreement to indemnify Glenfed for certain losses on non-performing loans (the "Credit Losses") net of "*all realized tax benefits....*" Merger Agreement ¶ 6.7(b) (emphasis added). This indemnity was to occur by reducing the balance of the Note.

In July 1987, the Note became due and payable. By the terms of the Merger Agreement, Glenfed was permitted to reduce the principal amount of the Note to the extent it was unable to collect money advanced on loan accounts purchased in the merger after "diligently pursuing collection in accordance with industry standards." Merger Agreement at ¶ 1.17. As of July, 1987, Glenfed had reduced the amount of the Note, as shown on its financial statements, to zero. At the same time, pursuant to another provision of the Merger Agreement, Armco was conducting an audit of Glenfed's collection practices and attempting to analyze the claimed reductions to the Note. Merger Agreement at § 8.4. Armco substantially completed the audit in November 1987 and concluded that Glenfed had been negligent in its collection procedures and had improperly accounted for amounts owed on the Note in a number of respects. On December 22, 1987, when Armco presented the Note to Glenfed for

---

**3.** The incorporation of the law of the State of California is significant, at least with regard to the Tax Motion and the absence of an effort to incorporate the provisions or definitions contained in the Internal Revenue Code.

payment, Glenfed refused to pay any part of it; this lawsuit was subsequently filed.

Setting aside the issue of the adequacy of Glenfed's effort to collect on the several loan accounts—an issue which Armco will continue to litigate in this matter—Armco presently argues in the Tax Motion that Glenfed failed to account for the "realized or realizable tax benefit" it could have achieved from the Credit Losses in determining the indemnification due from Armco. Complaint at ¶ 24(K). In order to adequately present the scope of the issue involved in the Tax Motion, it is necessary to review various provisions contained in the Merger Agreement and to set forth a number of defined terms referred to therein.

As noted, Armco agreed in Section 6.2 of the Merger Agreement to indemnify Glenfed for certain losses, including the Credit Losses[4] on purchased Loan Accounts which were uncollectible to the extent that the aggregate of such Credit Losses exceeded $5 million.[5] Armco's Credit Loss indemnification was limited to the balance due from Glenfed on the Note. The Merger Agreement provides:

*Limitations of Indemnities....* (d) To the extent that any indemnification shall be payable pursuant to Section 6.2(e), such payment shall be made, *and shall only be made,* by the reduction, on a dollar-for-dollar basis, in the principal amount of the Subordinated Promissory Note.

*Id.* at § 6.7 (emphasis added). The Note was due on April 9, 1987. If certain conditions occurred, however, the Note was payable only in part on April 9, 1987, with the balance, including accrued interest, payable on July 9, 1987.[6] Section 6.2 of the Merger Agreement must be read in conjunction with Section 6.7(b) of the Merger Agreement, which provides that:

(b) Notwithstanding anything to the contrary contained in Sections 6.1 through 6.4 and this Section 6.7, the Indemnitee shall be entitled to indemnification hereunder for any loss, damage, or expense which it suffered *only after giving effect to,* and taking the net amount after, *all realized tax benefits, realized insurance proceeds, and other realized recoveries* relating thereto.

*Id.* (emphasis added).

The Merger Agreement does not define the term "realized tax benefit" for purposes of this section or for purposes of any other section of the Merger Agreement.[7] As importantly, the Merger Agreement in no way indicates the term "realized tax benefits" should have any specialized meaning assigned to it.

During 1985, 1986, and 1987 (the "Credit Loss Years"), Glenfed claims it incurred

---

**4.** Credit Loss is defined at Merger Agreement § 1.17 as:

(a) the portion of any Loan Account, as in effect on the Closing Date, *less,* all subsequent collections, ... as to which portion GFC shall have pursued collection in accordance with industry practices and which shall in good faith have been determined to be uncollectible after (i) GFC, during the twenty-four month period commencing with the Closing Date (the "Holdback Period"), has demanded payment or declared an event of default to exist with regard to such Loan Account ... and (ii) GFC has failed, after diligently pursuing collection in accordance with prudent collection and credit standards ... to collect such portion; ....

*Id.*

**5.** Merger Agreement § 6.2 provides in part:

*Armco's Indemnification.* Armco agrees to indemnify and hold Glendale and GFC harmless against any loss, damage, or expense (including reasonable attorney's fees) suffered by

Glendale or GFC in connection with ... (e) all Credit Losses to the extent that aggregate thereof exceeds Five Million Dollars ($5,000,-000). Any payment by Armco hereunder or any reduction of the principal amount of the Subordinated Promissory Note shall be deemed to be an adjustment to the purchase price.

*Id.*

**6.** The conditions under which the due date of the Note was to be extended appear to be of no relevance to the Tax Motion; the parties did not discuss the circumstances under which the Note was extended. As discussed below, however, the fact that the parties provided for extensions on the Note under certain circumstances relates to the issue of the parties' ability to foresee, but fail to make any explicit provision for, other business contingencies.

**7.** Indeed, the terms "realized insurance proceeds and other realized recoveries relating thereto" in Section 6.7 are also undefined.

Credit Losses well in excess of the $5 million threshold. It was originally represented these Credit Losses were not deducted as bad debts pursuant to Section 166 of the Internal Revenue Code of 1954, as amended (the "Code"), or under any other section of the Code. In a letter to the court, dated July 10, 1989, however, counsel to Glenfed somewhat modified that representation. It was stated that:

> No deductions were claimed for the portion of the aggregate losses which were indemnified since, as stated above, indemnification resulted in a downward basis adjustment that eliminated any deduction to the extent of such indemnification. Of course, there would be no downward basis adjustment as to losses which were not indemnified, specifically the $5 million threshold as well as the excess over the $20 million in indemnified losses.

*Id.* As to the non-indemnity amounts, deductions appear to have been taken under Section 166. The meaning to the above representation becomes more clear after considering Glenfed's purported reasons for not taking Section 166 deductions with respect to the indemnified portion of Credit Losses, discussed below.

The opposing views of the parties on the Tax Motion are succinctly stated in Glenfed's brief. It is Glenfed's position it did not realize any tax benefits with regard to the Credit Losses, and that it therefore is entitled to indemnification with respect to all Credit Loss amounts in excess of the $5 million cushion and up to the amount of the Note, $20 million. Furthermore, Glenfed takes the position that it would not have realized tax benefits during the relevant period (*i.e.*, the term of the Note) even if it had taken deductions for Credit Losses, because the affiliated group of which Glenfed was a member had access to preexisting net operating loss carryovers ("NOLs") for the relevant taxable years.

Armco, on the other hand, contends all of the Credit Losses were required to be de-

ducted by Glenfed under Section 166 of the Code, that such losses, had they been deducted, would have increased the amount of NOLs available to Glenfed, and that such an increase in NOLs, in and of itself, constitutes a "realized" tax benefit. Having presented the larger picture of the Tax Motion, attention now shifts to the resolution of the several subsidiary issues raised by the parties.

*Sections 166 and 108(e)(5) of the Code*

In response to Armco's argument that Glenfed should have claimed bad debt deductions for the Credit Losses, Glenfed argues as a threshold matter that it was precluded under federal income tax law from taking such deductions. It is not necessary to conclusively resolve this issue against plaintiffs because it is ultimately concluded Glenfed would not have enjoyed "realized tax benefits" in any event, as discussed *infra.*

Section 166(a) of the Code provides for a deduction for any debt which becomes wholly or partially worthless within the taxable year. In determining whether a debt is worthless [8] in whole or in part, all facts and circumstances regarding the debt will be considered. Treas.Reg. § 1.66–2(a). Where the surrounding circumstances indicate a debt is worthless and uncollectible, and the legal action to enforce payment in all probability would not result in satisfaction on execution of a judgment, a showing of these facts will be sufficient evidence of the worthlessness of the debt and thereby entitle the taxpayer to a bad debt deduction without actually taking legal action. Treas.Reg. § 1.66–2(b).

A wholly worthless bad debt is deductible in the taxable year it becomes worthless. I.R.C. § 166(a)(1). A partially worthless bad debt is deductible in the taxable year it becomes partially worthless and is charged off by the taxpayer. I.R.C. § 166(a)(2); Treas.Reg. § 1.66–3(a)(2). The amount of a bad debt deduction for a wholly worthless loan is equal to the taxpayer's

---

8. In addition to worthlessness, the taxpayer must also prove that a bona fide debt existed in order to be entitled to a bad debt deduction. A bona fide debt is a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money. Treas.Reg. § 1.66.1(c).

adjusted basis in the debt. I.R.C. § 166(b); Treas.Reg. § 1.66–1(d)(1). The basis of a purchased debt is its cost. I.R.C. § 1012; Treas.Reg. § 1.66–1(d)(2)(i).

Glenfed has not taken the position it is prohibited from taking Section 166 deductions under any of the foregoing rules. Notwithstanding the standards for claiming bad debt deductions under Section 166, however, Glenfed argues such deductions, which would require reductions in "basis," would have been precluded by other tax treatment called for under the Merger Agreement and applicable tax rules.

As indicated, the purchase price paid for assets was divided into two components: a cash payment of $57 million and the execution of the Note in the amount of $20 million. Glenfed's argument that bad debt deductions (and corresponding reductions in basis) could not be effected under Section 166 relates to the fact that part of the purchase price constituted "purchase money debt" which was to be reduced pursuant to the indemnity provision. As described above, to the extent Glenfed suffered Credit Losses, it was entitled, pursuant to the indemnity provision in the Merger Agreement, to reduce the amount of the Note.

 The parties agree that under Section 108(e)(5) of the Code Glenfed must treat its indemnification by Armco as an adjustment to its purchase price for the assets of AFC, rather than as receipt of taxable income.[9] Noting that application of the principle of Section 108(e)(5) is mandatory in this case (Merger Agreement § 6.2),[10] Glenfed essentially argues that the additional application of Section 166 (for bad debt deductions) as proposed by plaintiffs would result in an anomolous situation as far as the "adjusted basis" in Glenfed's newly acquired assets is concerned.

Plaintiffs' approach would involve Glenfed, in the first instance, claiming deductions for the Credit Losses which were suffered. At the time of such deductions, Glenfed would be required to make corresponding reductions in the basis it had in the loan and lease accounts. Next, pursuant to the Merger Agreement, Glenfed would be indemnified by plaintiffs for the Credit Losses sustained. As indicated, indemnification would not come in the form of a cash reimbursement but instead as a reduction in the principal amount of the Note to be paid by Glenfed to Armco.

This procedure would constitute a reduction in the amount of purchase money debt under Section 108(e)(5). Such a purchase price reduction will not give rise to taxable income to the debtor, but, according to Glenfed, "the debtor is required *to reduce its basis in the property for which the debt was consideration.*" (Emphasis added) Defendant's First Brief at 8.

Glenfed's particular problem with plaintiffs' approach to the dual application of Sections 166 and 108(e)(5) of the Code is that, once the basis in the bad loan accounts has been reduced to reflect the bad debt expense deduction, there will be no basis remaining *in the loan accounts* to reflect the subsequent basis reduction pur-

---

**9.** Code § 108(e)(5) provides:
Purchase-money debt reduction for solvent debtor treated as price reduction.—If—
 (A) the debt of a purchaser of property to the seller of such property which arose out of the purchase of such property is reduced,
 (B) such reduction does not occur—
 (i) in Title 11 case, or
 (ii) when the purchaser is insolvent, and
 (C) but for this paragraph, such reduction would be treated as income to the purchaser from the discharge of indebtedness,
then such reduction shall be treated as a purchase price adjustment.
*Id.*
In addition, Merger Agreement § 6.2 provides that Armco's indemnification "shall be deemed to be an adjustment to the purchase price."

**10.** Section 108(e)(5) of the Code does not apply if the seller has assigned the debt or if the debtor-buyer has transferred the purchased property. The rule also does not apply if a debt is reduced because of factors not involving direct agreements between the buyer and the seller (*e.g.*, the running of the statute of limitations, or enforcement of the obligation). *Id.* In this case, the purchased property at issue, the loan accounts, was not transferred by Glenfed. Furthermore, Glenfed's right to the purchase price reduction was the result of factors involving direct agreements between the parties to the contract, i.e., the indemnity provision. Merger Agreement § 6.2.

suant to Section 108(e)(5). Glenfed considers it inappropriate or unusual to reflect the downward adjustment in the purchase price by reducing the basis Glenfed has in assets other than the loans, whose worthlessness initially triggered the purchase price reduction. In the words of Glenfed:

> the rule surmised (sic) by Armco's advisers, however, would permit a current deduction under section 166 even though the expenditure underlying that deduction was recovered in the year of the deduction, with such recovery taken into account merely as an adjustment to *the adjusted basis of other acquired assets.*

Defendant's First Brief at 10 (emphasis added). Stated alternatively, "the tax cost of an improper current deduction would be a potential tax increase in the indeterminate future (upon the sale of other property the basis· of which was adjusted)." [11] *Id.*

While Glenfed argues that the proposed Section 166 deductions would be "improper current deductions," at most it is suggesting that the result of subsequently reflecting the downward basis adjustment (resulting from the deemed purchase price reduction under Section 108(e)(5)) in other assets seems anomolous. No authority has been presented which indicates that Armco's proposed treatment of the Credit Losses is improper. Glenfed itself has indicated that regulations interpreting the operation of Section 108(e)(5) have not been issued and it has not located any authorities bearing directly on this issue. Defendant's First Brief, p. 10.

It is noted, moreover, that Glenfed's proposed reconciliation of the application of Sections 166 and 108(e)(5), in situations such as this one, gives rise to a strange result as well. Under Glenfed's construction of the rules, the owner of loan and lease accounts would be flatly denied a bad debt expense deduction for the Credit Losses, simply because of the fact that the purchase price for AFC was comprised of both cash *and* purchase money debt (which implicates Section 108(e)(5) of the Code). There appears to be no *direct* authority for such a result.[12]

Glenfed's position supports a result that, as between the anomalies of (1) effecting the purchase price reduction under Section 108(e)(5) by *reducing the basis in assets other than in the loan accounts which gave* rise to the purchase price adjustment and (2) eliminating altogether the availability of a deduction for bad debt expenses (which

---

**11.** Although it is an important issue more logically discussed in connection with the intended meaning of "realized tax benefit," *infra,* Glenfed points out that the result sought by plaintiffs is unusual because it provides a current Section 166 deduction whose tax value may be offset in the future by income recapture upon the sale of "other assets"—whose basis had to be previously reduced as a result of the Section 166 deductions. Quite apart from the fact that Armco's approach to Section 166 and 108(e)(5) of the Code results in adjusting the basis of assets unrelated to the loans and leases (whose worthlessness gave rise to the purchase price reduction), the approach gives rise to definite tax risk, the dollar impact of which should perhaps be considered in connection with assessing any "realized tax benefits."

Armco has argued that the mere generation of new NOLs (which might someday be utilized and result in future tax savings) constitutes a "realized tax benefit." Even if it did (which is contrary to the intent of the parties, as discussed *infra*), the amount of the tax benefit could not be assessed without due consideration given to, and appropriate offsets made for, the tax detriment arising in the form of potential income recapture triggered by other asset sales as well as speculation as to the level of future tax rates.

**12.** Glenfed has drawn analogies to other principles of federal income tax to support its position that Section 108(e)(5) properly should be interpreted to require, in the taxable year of a purchase price adjustment, a redetermination of the basis of the property that triggered the purchase price adjustment, with any current year depreciation, amortization, or expense deduction attributable to such property computed after the basis adjustment. Glenfed refers to the Senate Report for the Bankruptcy Tax Act of 1980, which provides that property subject to basis adjustment is the property giving rise to price reduction: "the reduction to the purchaser of the purchase-money is to be treated (for both the seller and the buyer) as a purchase price adjustment on that property." Senate Report at 7031. Defendant's First Brief at pp. 10–12.

Glenfed further notes that, for purposes of depreciation or amortization, the basis of property subject to a purchase price reduction is reduced as of the beginning of the taxable year in which the purchase price adjustment occurs. (Citing cases). *Id.* at pp. 10–12.

were in fact incurred), the former anomoly is more important to avoid than the latter.[13]

Because it is concluded that, even if Glenfed had claimed deductions for all of the Credit Losses, it would not have "realized tax benefits" within the meaning of the Merger Agreement, it is not necessary to explicitly reject Glenfed's interpretation of the interrelationship between Sections 166 and 108(e)(5) in this situation. Accordingly, for purposes of the Tax Motion, plaintiffs' construction of the applicable rules is accepted and it is assumed that Glenfed, under applicable tax law, could have claimed Section 166 deductions for the Credit Losses in the year they were sustained.[14]

■ Glenfed next argues that, even if it is assumed Section 108(e)(5) does not preclude the applicability of Section 166, it was not *required* under federal tax principles, or explicitly by the Merger Agreement, to take deductions for the Credit Losses. The Board of Tax Appeals noted in a 1925 case that "a taxpayer may neglect or refuse to make a correct computation of income in a given year and pay a greater tax than he owes—and nobody will force the excess tax back upon him." *Even Realty Co. v. Commissioner*, 1 B.T.A. 355, 362 (1925).

It is pursuant to the Merger Agreement (although not explicitly provided for)[15] that Glenfed was duty-bound to take advantage of the Section 166 deductions for the Credit Losses to the extent available. As persuasively explained in plaintiffs' brief, in interpreting a contract, a court must give all of its terms a reasonable and lawful meaning. *See Restatement (Second) of Contracts*, § 203(a) (1979).

Section 6.7(b) of the Merger Agreement provides:

Notwithstanding anything to the contrary contained in sections 6.1 through 6.4 and this section 6.7, the Indemnitee shall be entitled to indemnification hereunder for any loss, damage, or expense which it suffered <u>only after giving effect to, and taking the net amount after, all realized tax benefits,</u> realized insurance

---

13. As indicated, any downward adjustment to the basis of other assets might negate the tax benefit that would have accrued from the deduction. The potential future "income recapture" (resulting from the reduction in the basis of other assets and a subsequent asset sale) may well offset the potential future decrease in tax (resulting from the use of newly generated NOLs).

Plaintiffs have flatly asserted that the value of deductions for bad debts (at the time Credit Losses were incurred) exceeds the cost of a future recognition of income (in the same amount), if any, upon disposition of those assets. At the time the Merger Agreement was signed, or even at the time of the Credit Losses, however, it was difficult, if not impossible, to compare the relative value of the deductions vis a vis the detriment of the basis reductions in "other assets." Such an assessment would depend upon, among other things, knowledge of when the new NOLs could be utilized, when sales of the other assets might occur and the level of the tax rates at that time.

14. Armco, at least on this particular issue, places particular emphasis on the agreement between the parties, rather than principles of federal tax law. It is noted that while Glenfed suggests the purchase price should be adjusted in the same tax year in which it takes a bad debt deduction for a corresponding Credit Loss, nothing in the Merger Agreement provides that Glenfed is entitled to indemnification (and, therefore, a purchase price adjustment) at the time that it is entitled to a bad debt deduction. Instead, plaintiffs argue, the Merger Agreement requires Armco to indemnify Glenfed in tax years subsequent to the tax years in which Glenfed may claim its bad debt deductions, i.e. the year Credit Losses are suffered.

The Merger Agreement provides that:
... the Indemnitee [Glenfed] shall be entitled to indemnification hereunder for any loss, damage, or expense which it suffered *only after* giving effect to, and taking the net amount after, all realized tax benefits, realized insurance proceeds, and other realized recoveries relating thereto.
*Id.* at § 6.7(b) (emphasis added). Armco argues that the Note was payable in the 1987 tax year, at which time Glenfed had already suffered Credit Losses in excess of the Note's balance. Thus, at the first opportunity to make the purchase price adjustment, the basis of the Loan Accounts to which such Credit Losses related would have been reduced.

15. Glenfed suggests that, because Sections 6.5 and 6.6 of the Merger Agreement demonstrate the parties negotiated and agreed to certain actions and defenses on the part of Glenfed and Glendale with respect to federal income tax liability (arising with regard to issues other than Credit Losses), the absence of a specific provision concerning Credit Losses indicates the non-existence of any duty.

proceeds, and other realized recoveries relating thereto.

*Id.* (emphasis added). The underscored language would be meaningless if Glenfed could simply decide at its whim whether to take available deductions which produce realized tax benefits. Accordingly, the only reasonable interpretation to which this language is susceptible is that Glenfed must conduct itself in such a manner so that all realized tax benefits which are available and to which it is legitimately entitled are in fact enjoyed by it.[16]

### Realized Tax Benefits

■ The dispositive issue in the Tax Motion involves a question of contract law, not federal income tax principles: whether Glenfed realized tax benefits, within the meaning of the Merger Agreement, as a result of Credit Losses—or stated another way whether it could have realized such benefits had it taken bad debt deductions to which it was entitled under Section 166. For two chief reasons (which are perhaps interrelated) it is concluded that, even assuming Section 166 deductions had been claimed, Glenfed would not have enjoyed "realized tax benefits" within the meaning of the Merger Agreement. First, the Merger Agreement term "realized tax benefits" contemplates more than mere hypothetical tax benefits which probably, but not necessarily, will result in a dollar reduction of taxes payable at some time. Second, the structure of the Merger Agreement, particularly the indemnity provision, indicates the parties intended their ongoing relationship to be severed in significant ways by the time the Note became due in 1987.

In this context, that means Glenfed would only be entitled to indemnification for Credit Losses identified within the two year period and plaintiffs would only be entitled to offset the amount of the indemnity in an amount representing realized—not hypothetical—tax benefits actually en-

joyed during the same period. As discussed in greater detail below, both the narrow language contained in the Merger Agreement and an absence of a special mechanism for treating the measurement of "realized tax benefits" over a specified period of time essentially requires the court to step in and rewrite the Merger Agreement in order for plaintiffs' position to prevail. This will not be done. The patent terms of the Merger Agreement will be given effect. This result obtains from the so-called "objective theory of contract," under which the subjective, undeclared, intentions of the parties are immaterial, because manifestation of intention (as reflected in the language) controls. *See, e.g., Heston v. Farmers Insurance Group,* 160 Cal.App.3d 402, 206 Cal.Rptr. 585 (1984).

In construing a contract which purports on its face to be a complete expression of entire agreement between the parties, courts will not add another item on which the agreement is silent. *Wm. E. Doud & Co. v. Smith,* 256 Cal.App.2d 552, 64 Cal. Rptr. 222 (Cal.Ct.App.1967). The undisclosed intentions of parties to a contract are not material. *Id.* 64 Cal.Rptr. at 226. *See also Rosen v. E.C. Losch, Co.,* 234 Cal.App.2d 324, 44 Cal.Rptr. 377 (Cal.Ct. App.1965) (court is without power, under guise of contruction, to depart from plain meaning of words contained in writing and insert terms or limitations not found therein). In arriving at the intentions of the parties to a written contract, courts cannot be guided by an unexpressed state of mind. *Crow v. P.E.G. Construction Co.,* 156 Cal. App.2d 271, 319 P.2d 47 (Cal.Ct.App.1957) (when language of contract is plain and unambiguous it is not within province of court to rewrite or alter by construction what has been agreed upon).

Armco concedes that the Merger Agreement, particularly the indemnity provision with the tax benefit offset, was poorly drafted and lacks clarity. Plaintiffs' Second Brief, p. 18. If the business under-

---

16. In addition, contracts have an implied covenant of good faith and fair dealing. *Jacobs v. Freeman,* 104 Cal.App.3d 177, 188, 163 Cal.Rptr. 680, 686 (Cal.Ct.App.1980); *accord Ohashi v. Verit Industries,* 536 F.2d 849 (9th Cir.), cert *denied,* 429 U.S. 1004, 97 S.Ct. 538, 50 L.Ed.2d 616 (1976); *Re Community Medical Center,* 623 F.2d 864, 866 (3d Cir.1980), *citing Tessmar v. Grosner,* 23 N.J. 193, 128 A.2d 467 (1957).

standing of the parties was what plaintiffs now assert it to be, it is easy to imagine how the Merger Agreement could have been more clearly drafted in fundamental ways. As described further below, for example, Armco could have provided for future adjustments to be made for realized tax benefits by including a covenant on the part of Glenfed to pay over to Armco the dollar value of NOLs as they are utilized and reduce actual tax bills in the future. This was not done.

As of June 30, 1984, the Glendale Consolidated Group was in a tax loss carryforward position, with $548 million in NOLs expiring between 1987 and 1989. Furthermore, as of June 30, 1987, the Glendale Consolidated Group had NOLs available for utilization which would expire in 1991 and 1992.[17] According to Glenfed, it experienced Credit Losses during the relevant years as follows:

| | |
|---|---|
| Net Credit Loss—1985 | $21,308,385 |
| Net Credit Loss—1986 | $ 4,963,314 |
| Net Credit Loss—1987 | $ 4,488,664 |
| TOTAL NET CREDIT LOSSES | $30,760,363 |
| Credit Loss on Final Disposition of Assets Held for Resale | $ 1,328,044 |
| TOTAL WRITE–OFFS (Net of Recoveries) | $32,088,407 |

On December 22, 1987, plaintiffs presented the Note to Glenfed for payment. Glenfed refused to make payment of any amount on the Note, asserting that, on the basis of Section 6.2 of the Merger Agreement, it was entitled to indemnification for the full amount, computed as follows:

| | |
|---|---|
| TOTAL NET CREDIT LOSSES (04/10/85—04/09/87) | $32,088,407 |
| Less: $5 Million Threshold | ($ 5,000,000) |
| Amount Subject to Indemnification | $27,088,407 |
| Less: Maximum Indemnity for Agreement | $20,000,000 |
| Excess Write–Offs Over Indemnity | $ 7,088,407 |

As indicated, no Section 166 deductions were claimed by Glenfed in respect of the Credit Losses for which it was to be indemnified.[18]

In the Complaint, plaintiffs claim Glenfed breached the Merger Agreement by "asserting claims for indemnification for losses in amounts which do not give effect to and take the net amount after all *realized or realizable*[19] tax benefits as required by Section 6.7(b) of the Merger Agreement." Complaint ¶ 24(k) (emphasis added). It is Armco's contention that Glendale was required to deduct all Credit Losses in the Glendale consolidated tax return, that such deductions, if taken, would have generated new NOLs, and that an increase in NOLs, in and of itself, constitutes a "realized tax benefit" for purposes of the Merger Agreement.

Plaintiffs have not argued in this dispute that Glenfed, or the Glendale consolidated group, could have utilized any of the contested Section 166 deductions in a way that would have reduced the tax liability (actual tax bill) on a current basis (i.e., in the same year as the Credit Losses). Nor has it been argued that, in light of the Glendale consolidated group's tax paying position

---

17. According to the Glendale 1984 Annual Report, the NOLs available in 1984 would expire as follows:

| Year | Amount of NOL Expiring |
|---|---|
| 1987 | 145,000,000 |
| 1988 | 225,000,000 |
| 1989 | 148,000,000 |
| | $548,000,000 |

Defendant's First Brief, p. 6. These data were public, available in several filings with the Securities and Exchange Commission. As well, as conceded by plaintiffs' counsel at oral argument, these data are of the type plaintiffs should have been aware of as a result of appropriate due diligence activities surrounding the negotiation and closing of the Merger Agreement.

18. Section 166 deductions appear to have been claimed, however, for the non-indemnified por-

tion of Credit Losses (i.e., the $5 million threshold amount together with the $7 million in excess Credit Losses).

19. The term, "realizable," does not appear in this context in the Merger Agreement. Inclusion of the qualifier "realizable" in the Complaint, but the noticable absence of it from the contract itself, is telling. Indeed, it highlights the chief defect in plaintiffs' position on the Tax Motion, which plaintiffs appear to recognize. Obviously, if the Merger Agreement had contained the term "realizable" as a modifier of the term "tax benefit," the plaintiffs would have a better argument that new NOLs available to offset future operating income, if any, constitute a current or realizable tax benefit.

(i.e., size of annual income, amount of other deductions and amount of existing NOLs), was it in a position to make use of the new NOLs which might have been generated based upon deductions claimed for Credit Losses. It was not argued, for example, that although the Glendale consolidated group had a vast inventory of NOLs, it was obligated, or would be deemed, under the Merger Agreement to have utilized the newly generated NOLs first in offsetting income during the years soon after the closing.[20] The breadth of plaintiffs' argument appears to be fairly limited: to the degree Glenfed could have generated new NOLs during the two year indemnity period (which might be utilized to reduce the Glendale consolidated group's future tax burdens), it would have realized a tax benefit in the year the Section 166 deductions were taken and additional NOLs were generated.

### The Qualifier "Realized"

While plaintiffs appear to acknowledge that Glenfed would not have enjoyed any actual dollar savings on its tax bill during the two year indemnity period as a result of Section 166 deductions for Credit Losses, they strenuously argue that, under federal tax law principles, the newly created NOLs constitute a realized tax benefit. The inescapable conclusion to be drawn, however, is that this is a straightforward contract dispute. It is unnecessary, and perhaps dangerous, to venture off to income tax rules and regulations [21] in an effort to confer more explicit meaning to the term "realized tax benefits," particularly where there exist a plethora of alternative authorities by analogy. The parties affirmatively stated in the Merger Agreement that, as far as general contract law is concerned, the laws of the State of California shall apply. Merger Agreement § 9. If the parties had intended that federal income tax principles would place a gloss on the term "realized taxed benefits," this could have been (and, if it was the intent, presumably would have been) set forth in the Merger Agreement.[22] It is not the province of a court to rewrite the Merger Agreement to provide for the importation of federal tax law principles where, if that was the intent, the sophisticated plaintiffs

---

**20.** An accounting concept concerning the measurement of inventories may be useful by way of analogy. In pricing inventories, a business concern might make use of the LIFO method (last in, first out), the FIFO method (first in, first out) or some variation on the two of these methods. T. Fiflis and H. Kripke, *Accounting for Business Lawyers,* 245–6 (1971). If the parties intended to invoke for purposes of the Merger Agreement a so-called "LIFO method" for treating the utilization of NOLs, it could have been explicitly so stated. However, with the pre-existence of $548 million in NOLs there appears to be no basis to assert a LIFO method for any NOLs generated under the Merger Agreement.

**21.** It is true that it was previously necessary in this matter to address (although plaintiffs' position was merely assumed) the interrelationship between Sections 166 and 108(e)(5) of the Code, and to determine whether Glenfed was permitted (as a federal tax law matter) to take deductions for Credit Losses in the first instance. That inquiry was appropriate because the IRS had a stake in, and indeed the ability to control, Glenfed's deductions. The present issue—the meaning of realized tax benefit in the Merger Agreement—is not a concern of the tax authorities. It simply determines the rights between two private contracting entities.

**22.** Plaintiffs argue that the term "realized tax benefit" is a term of art clearly defined in the tax laws. *See, e.g., Committee Report, Bankruptcy Tax Act of 1980* at *Deloitte Report,* p. 5. Plaintiffs argue that because the issue is whether a tax benefit is realized, "what better authority than the tax laws?" Plaintiffs' Second Brief, p. 19. While this suggestion has certain superficial appeal, it tends to give rise to a result which seems unintended by the parties, as discussed further below.

Plaintiffs also argue that courts have recognized that Code provisions should be incorporated by reference in contracts that invoke them. (Citing *Fischer & Porter Co. v. Porter,* 364 Pa. 495, 72 A.2d 98 (1950) (court held that the terms "refunds" and "repayments" contained in a sales contract were technical terms, whose full meaning is ascertained by reference to the Code section providing for NOL carrybacks); *see also Starobin v. Miskowitz,* 280 A.D. 629, 116 N.Y. S.2d 475 (App.Div.1952), *appeal dismissed,* 305 N.Y. 567, 111 N.E.2d 441 (1953)). In this case, however, reference to the Code will not be made for two reasons. First, it is not clear the parties intended to invoke a Code provision. Second, it is not clear that the term "realized tax benefits" (or for that matter "realized insurance proceeds" or "other realized recoveries relating thereto") is a technical term, although plaintiffs would like to treat it as one.

could have so provided. *See Doud & Co., supra,* 64 Cal.Rptr. at 226; *Crow, supra,* 319 P.2d at 47.

Having found this to be a contract dispute which does not depend upon the application of special tax principles, it is noted that the tax analogy drawn by plaintiffs is not dispositive in any event. Armco argues that under Code Section 111(a), a deduction is deemed to have produced a tax benefit in a prior year if the deduction reduced the amount of a tax imposed in the year of deduction. Under Code Section 111(c), a deduction that increased a "carryover" (i.e. an NOL) in a prior year that has not expired before the taxable year in question *is treated* as having reduced the amount of tax imposed by the Code.[23] It is noted at the outset that Section 111(c) does not dictate whether Glenfed has in fact "realized tax benefits" by virtue of generating NOLs (the statute talks in terms of *"treat[ment] as reducing tax imposed"*).[24]

On the issue of the plain meaning of "realized tax benefit" plaintiffs argue it includes an addition to an NOL carryover which *"will be utilized*[25] before its expiration."* Plaintiffs' Second Brief, p. 20 (emphasis added). Plaintiffs argue that: "Stripped of the Tax Code and Treasury Regulations, an NOL carryover boils down to a simple concept. An NOL carryover is nothing more than the opportunity not to pay taxes in the future. This opportunity has a distinct, tangible value which, for

common sense to prevail, evidences a realized tax benefit." *Id.*

Plaintiffs understate the significance of including the modifying term "realized" to describe what kinds of tax benefits will be available to offset plaintiffs' duty to indemnify for Credit Losses. It is arguable that, without the qualifying adjective "realized," the creation of new NOLs resulting from Credit Losses would constitute "tax benefits." Until they are utilized, however, they would be merely potential, or unrealized, tax benefits, the monetary value of which would depend upon a variety of circumstances including (1) the continued ability of the taxpayer to generate income upon which taxes are due, (2) the non-existence of other pre-existing tax attributes which rendered new NOLs currently unusable and the rate of tax then in effect when such NOLs are used. In effect, without a contractually agreed upon formula, the value of the future utilization of such NOLs is speculative, especially with the recent and potentially continuing change in federal tax rates.

In analyzing the objective intent of the parties, *see Heston, supra,* in including the modifier "realized" to describe the kinds of tax benefits which were to offset Armco's indemnity obligations, it is interesting to note that the same qualifier—"realized"— was included as a modifier of the terms "insurance coverage" and "other recover-

---

**23.** I.R.C. § 111(c) provides:
 *Treatment of Carryovers.* For purposes of this section, an increase in a carryover which has not expired before the beginning of the taxable year in which the recovery or adjustment takes place shall be treated as reducing tax imposed by this chapter.

**24.** Furthermore, to the extent that federal tax principles are deemed to control or even provide guidance in this non-tax dispute (this is a contract case involving the value of tax attributes, not a tax dispute involving the propriety of a tax position vis a vis the tax authorities), Glenfed notes that Section 111(c) of the Code is a specific provision to be applied in specific circumstances. Glenfed goes on to draw other anologies to federal tax law which, if accepted, compel the opposite result. For the reasons indicated, including the fact that Section 111(c) does not purport by its terms to indicate wheth-

er a tax benefit was "realized" (only concerns treatment), it is unnecessary to sort through and identify the most compelling among a number of tax code analogies.

**25.** Once again, plaintiffs' pleadings and supporting submissions can be said to contain the kind of language which, if contained in the Merger Agreement, would support their position. The whole point to Glenfed's position is that it remains unclear whether new NOLs, if they had been generated, "will be utilized." If it could have been concluded with certainty at the time the Merger Agreement was signed, or at the time of the disputed Section 166 deductions, that the new NOLs "will be utilized," it might be fair to conclude there has been a "realized tax benefit." (*Compare* the inclusion by plaintiffs in the Complaint of the term "realizable"—a term very much absent from the contract itself).

ies."[26] The clear understanding that is created by this language is that, with respect to all of the possible benefits which might mitigate a particular loss, Armco's duty to indemnify for the loss will only be reduced by the amount of actual, or "realized," mitigation. In general, the Merger Agreement required *"realized recoveries,"* not intangible attributes potentially giving rise to recoveries in the future.

Plaintiffs have addressed the issue of the current tax position of Glendale consolidated group and it appears that, should Glenfed and its affiliates continue to earn money, the NOLs which may have been generated as a result of the Credit Losses may well have been usable in future tax years. The point, however, is what the parties objectively intended in 1985, when the Merger Agreement was negotiated and drafted. *See Kemmis v. McGoldrick,* 767 F.2d 594, 597 (9th Cir.1985) (where there is an ambiguity in a contract provision, the parties' intent at the time of execution will control the interpretation of that provision). At that time the Glendale consolidated group had available NOLs in an amount exceeding $500 million. Because it was less than certain that new NOLs generated as a result of Credit Losses during the indemnity period would be usable, and the

facts surrounding Glenfed's tax position were available to all parties,[27] it is understandable why Glenfed would insist on inclusion of the qualifier "realized" tax benefits.

Plaintiffs, citing several business articles concerning business acquisitions, point out that corporate executives clearly view existing NOLs as an asset which, in many cases, justifies acquiring a business at a higher purchase price. It appears investment bankers and company executives, among others, are capable of predicting the future earnings capacity of a business (and therefore the estimated tax liabilities) and that some estimated purchase price can be formulated when acquiring unused NOLs.[28] However, after analysis, these articles and the argument advanced undercut plaintiffs' position. The Merger Agreement is quite clear in speaking of realized tax benefits and in providing a relatively short period to determine credit losses, realized tax benefits and adjust the Note accordingly. Had the parties agreed otherwise, they could have so stated; as plaintiffs point out, the concept they advance is neither novel nor arcane.

Glenfed's reference to the common understanding of the meaning of the term

---

26. The indemnity amount was to be reduced by "realiz*ed* tax benefits, realiz*ed* insurance coverage and other realiz*ed recoveries* relating thereto." Merger Agreement § 6.7(b).

27. The status of Glenfed's access to pre-existing NOLs was set forth in Glendale's annual report to shareholders, as well as in various documents required to be filed by public companies with the Securities and Exchange Commission. It was conceded at oral argument that the tax position of Glenfed and its affiliates concerned information readily available to and known (or which should have been known) by plaintiffs. See note 17, *supra.*

28. As if it was not clear that the unused NOLs (which could have been generated) had some imprecise value, Armco belatedly offered the following hypothetical: An individual is given a $10 promissory note on December 15, 1988, with a due date of January 15, 1989. The note, however, can only be used to pay January, 1989 credit card charges, it being noted that the individual "regularly charges at least $50 per month." On the question whether the individual felt as though he "realized a benefit" by receiving the note in December, plaintiffs' counsel

is confident the answer would be yes. It has value to the extent the individual knows that— either through his regular spending pattern or in a special effort to ensure at least $10 in credit card charges are made—the note will in fact offset credit card bills.

Two observations are made with regard to the hypothetical. First, whereas the individual above can ensure the note has future use simply by making a single $10 expenditure on his credit card, in the instant matter it was less clear (at the time the contract was made) Glenfed would necessarily be able to generate future profits, as well as deplete $500 million in pre-existing NOLs. Second, while it is perhaps true that Glenfed would rather have the NOLs than not have them (although, as indicated, Glenfed did *not* take the Section 166 deductions), there is marked distinction between agreeing that a tax attribute might have some estimable present value and agreeing to make various settlements in respect of other accounts based on the unknown value. In short, plaintiffs' hypothetical is an analogy of sorts, but it does not resolve the present dispute.

"realized" is persuasive. *Webster's New World Dictionary* (Prentice Hall Press 1986) provides the following meanings for the word "realize:"

> 1. to make real; bring into being; achieve 2. to make appear real 3. to understand fully; apprehend (to realize one's danger) 4. to convert (assets, rights, etc.) into money 5. to gain; obtain (to realize a profit) 6. to be sold for, or bring as profit.

*Id.* None of these meanings suggests the term "realize" was intended to apply to a contingency or possible future event. Glenfed properly notes that treating an increase in a NOL, which may or may not ever produce an actual benefit, as being a realized event, has the effect of applying the word "realized" to a theoretical contingency.

### The Time Horizon for Determining Realized Tax Benefits

As indicated above, apart from the ambiguity plaintiff has now attempted to create, the indemnity provision contained in the Merger Agreement was very specifically drafted,[29] such that any indemnification by plaintiffs to Glenfed for Credit Losses suffered would be paid, *"and only be paid,"* by dollar for dollar reductions in the amount of the Note payable by Glenfed in either April or July of 1987.[30] The explicit emphasis on the form of indemnity—reductions in purchase money debt which was due within two years after closing—sends the clear message that the parties did not intend there to exist lingering liabilities and contingencies for an indeterminate or open-ended period. Whereas the Merger Agreement could have provided that plaintiffs would indemnify Glenfed for Credit Loss suffered over a more extended period of time (either by providing additional extensions on the due date on the Note or agreeing to reimburse Glenfed for Credit Losses realized beyond the payment of the Note) or could have provided for adjustments because of future tax benefits enjoyed by Glenfed not factored into the payment formula for the Note, it is clear that the plaintiffs intended to impose a limited time frame on their exposure to indemnity obligations. In this way plaintiffs, after a reasonable period of time upon completing the sale of a business, could engage in strictly forward-looking enterprises without the risk of claims by Glenfed.

Despite the obvious effort of the parties to place a strict time frame on the ongoing relationship between them, plaintiffs have now attempted to argue a position that, if accepted, would effectively deprive Glenfed, and only Glenfed, of the benefit of the bargain—eliminating nagging uncertainty as to financial responsibility to plaintiffs beyond a specified period of time. There is no indication from the language in the Merger Agreement that only plaintiffs' (and not Glenfed's) exposure to further financial obligations would be conclusively determined at the time the Note became due.

Plaintiffs have proffered an interpretation of the Merger Agreement which they contend would afford Glenfed the same ability to settle, with finality, its affairs

---

**29.** In addition, as discussed further below, in connection with the Deferred Income Motion, a number of terms in the Aircraft Agreement contain particularly specific and detailed definitions. The failure by apparently careful and detailed drafters to provide a more particular definition for the term "realized tax benefits" further undercuts Armco's preferred interpretation of that term.

**30.** At oral argument, plaintiffs' counsel made the observation that Glenfed's construction of the phrase "realized tax benefit" allows for the following absurd result: Glenfed could manipulate the timing of the Section 166 deductions in a way so that the resulting tax refund would arrive sometime, if only slightly, after the due date on the Note, thereby depriving Armco of the "indemnity offset." It is agreed that such a set of facts and consequent result—which are not presented in this case—would be absurd. As indicated, Glenfed has a contractual duty of fair dealing and good faith requiring it to optimize the possibility of realized tax benefits for Armco's benefit. In this case, the question of whether the new NOLs will reap actual tax benefits depends, in large part, upon factors beyond Glenfed's control. While Glenfed can, of course, influence its ability to continue to earn profits, the key fact here is the pre-existence of $500 million in NOLs which, under the circumstances presented, prevented the effectuation of realized tax benefits.

with plaintiffs at the time the Note became due. According to plaintiffs, the steps in computing Armco's indemnification are:

1. Determine Glenfed's aggregate Credit Loss. Merger Agreement §§ 1.17, 6.2(e) & 6.7(d).

2. "Tax effect" the Credit Loss. Merger Agreement § 6.7(b).

3. Reduce the payment on the Note by the tax effected Credit Loss amount. Merger Agreement § 6.7(d).

According to Armco, Glenfed violated the Merger Agreement by skipping step 2 above. Plaintiffs' Second Brief, p. 3.

For the reasons discussed above in connection with the discussion of the probable meaning of the qualifier "realized," this interpretation is rejected. Step 2 involves significant speculation as to the ultimate value of the NOLs, which is incongruous with the specificity otherwise contained in the narrowly drafted indemnity provision. If the parties intended for the value of *"realizable* tax benefits" to be estimated at the time of settling the Note, so that both plaintiffs and Glenfed could go their own ways at that time, such an understanding (and formula) could and should have been set forth. Again, it is not the function of courts to redraft agreements to reflect the subjective intention of one of the parties. *See Doud & Co.* and *Crow, supra.*

Among other things, one can imagine the need to document the method of calculating, and the mechanism for resolving disputes over, the estimated present value of tax attributes to be utilized some time in the future. Such a calculation involves several assumptions including the amount of future income, the rapidity with which other NOLs are utilized and the likely tax rate to be imposed at a future date. At oral argument, plaintiffs' counsel stated that there are issues over which there could be substantial dispute. If this was anticipated, the parties could and should have provided appropriate contract provisions.

On the other hand, although the parties' papers do not specifically address such an approach, it is easy to imagine how the parties could have drafted the Merger Agreement to address "obvious business concerns" over a period of time extending beyond the due date of the Note. Where the language of the Merger Agreement is rendered ambiguous (solely insofar as plaintiffs purport that it supports their construction [31]), it is a useful exercise to consider the language in light of its presumed purpose. The apparent purpose of the parties in providing for the indemnity was to make Glenfed whole for actual or net losses suffered. If the focus was on actual losses, it would be anomolous to factor in hypothetical or uncertain tax benefits which unused NOLs may someday in the future produce.

It is understood that the unused NOLs [32] remain on the books of Glenfed and may someday in the future produce an actual dollar savings for the Glendale consolidated group. Various kinds of mechanisms could have been drafted to return to plaintiffs the value—ultimately realized—of NOLs utilized beyond July 1987, when the Note became due. In discussing the importance of clear drafting with respect to indemnification provisions pursuant to business acquisitions, a commentator has written the following:

> If there is a specific clause on damages [in the indemnification provision], seller may want a provision giving it the benefit of any reduction in taxes that buyer realizes from the payment of any claim for which seller is responsible. Again, the clause is not easy to draw, particularly since the tax benefit, with possible loss carryback or carryforward involved, may

---

**31.** The language "realized tax benefits" is not ambiguous insofar as Glenfed's position is concerned; it would ordinarily be assumed that the qualifier "realized" would necessitate the "realization" of actual tax savings. On the other hand, the language is at best ambiguous (and certainly less than explicit) if it is to be susceptible of plaintiffs' proposed construction.

**32.** Again plaintiffs are given the benefit of all inferences and it is therefore inferred Glenfed would have increased the amount of its NOLs if appropriate deductions for the Credit Losses were taken.

be in a different form than the year of payment of the claim. Whatever may be the effect of this kind of provision, it seems clear that *in the absence of such a specific provision, seller will not be entitled to any tax benefits realized by buyer.*

Weinreich, "Contract of Sale," 1 *Business Acquisitions* 189–90 (PLI 1981) (emphasis added). Among the various provisions which plaintiffs could have negotiated and drafted into the Merger Agreement include an escrow mechanism requiring Glenfed, at the time the Note was due, to place in escrow that amount of money which approximates the then estimated value of newly generated NOLs. The escrow account would continue pending the realization (or perhaps unused expiration) of the NOLs, and be distributed to the parties in accordance with the tax savings, if any, achieved. Alternatively, to the extent Glenfed was considered a "good credit," plaintiffs could have sought the inclusion of a covenant on the part of Glenfed (which would survive the closing and continue indefinitely) [33] requiring it to pay over to Armco the dollar value of the NOLs as they are utilized and result in actual tax savings. The plaintiffs are effectively asking the court to step in and rewrite the Merger Agreement to give them the benefit of such provisions. As indicated above, this is not the function of the courts. Sum-

mary judgment is granted in favor of Glenfed on this issue.

## II. The Deferred Income Motion

*Overview*

As indicated above, this motion centers around an agreement (the "Aircraft Agreement") pursuant to which Glenfed (as new owner of the AFC assets) and Armco (as seller) were to share the proceeds from certain aircraft loan accounts (the "aircraft portfolio"). The basic operation of the sharing formula, which involves the incorporation of multiple terms with explicit and sometimes complex definitions,[34] is not at the crux of this dispute. The parties appear to agree, as a general matter, with the way in which the formula works. The dispute, at least insofar as it is presented in the Complaint, centers on the correct dollar figure of "Book Value," one of the several key defined terms which together determine how much, in dollar terms, Armco is entitled to share pursuant to the Aircraft Agreement.

The following description of the terms in the Aircraft Agreement is mostly undisputed by the parties and provides a useful introduction to the narrow issue in dispute.[35] The operative clause of the Aircraft Agreement provides that Armco is entitled to a thirty-five percent share of the Distributable Proceeds, as defined in the

33. Such a covenant was negotiated and included by the parties in the Aircraft Agreement, as it related to Glenfed's obligation to share "Distributable Proceeds," discussed below. (Glenfed agreed to "pay or cause to be paid ... upon receipt ... [insurance proceeds] *at any time, and from time to time*"). *Id.* at § 2 (emphasis added). The Aircraft Agreement, including the arrangement to share certain proceeds, was negotiated as an integral part of the Merger Agreement including the pricing provisions.

34. The Aircraft Agreement is part of the overall Merger Agreement and provides for part of the consideration Armco was to receive pursuant to the Merger Agreement. In this regard, there is a clear contrast between the highly specific definitions of the contract terms at issue in the Deferred Income Motion (set forth below), on the one hand, and the non-specific definition of the phrase "realized tax benefit" (the key term at issue in the Tax Motion), on the other. The inference to be drawn is that the sophisticated

parties sought to include carefully defined terms in the contracts where the terms were intended to have anything other than their common sense meaning. Stated alternatively, if the parties meant for "realized tax benefits" to have a special meaning in light of Code analogies, the specific definitions of the terms in the Aircraft Agreement suggest that such an intent would have been made clear.

35. As discussed in greater detail below, Armco does not exactly dispute the correctness of Glenfed's basic description of the Aircraft Agreement or its terms; instead, Armco argues that Glenfed's explanation for a glaring inconsistency contained in an exhibit to the Aircraft Agreement (that a typographical error was committed) is misleading in that it fails to acknowledge, and attempts to "wish away," several facts concerning the negotiation history. Armco contends that exploration of this history reveals its position on the Deferred Income Motion should prevail.

Aircraft Agreement. This clause reads as follows:

> 2. *Additional Purchase Price.* As part of the consideration to be received by Armco pursuant to the Merger Agreement for the stock of AFC, *Glenfed agrees to pay or cause to be paid to Armco* promptly upon receipt by AFC and/or Glenfed *at any time, and from time to time, an amount* equal to 35% of the Distribual Proceeds, if any.

*Id.* at § 2 (emphasis added).[36]

"Distributable Proceeds" are defined as the total of the proceeds derived from three separate transactions, to the extent that such total exceeds the "Book Value." More specifically, the Aircraft Agreement defines "Distributable Proceeds" as "the total of all Avemco Proceeds, Frontier Proceeds and Insurance Proceeds payable to or on behalf of Armco Financial and/or Glenfed in excess of the Book Value." Paragraph 1(H). "Avemco Proceeds" pertains to an Armco claim against Avemco Insurance Company arising from a 1983 DC–8 accident; "Frontier Proceeds" involves revenues derived from aircraft, parts, and equipment leased to Frontier Airlines, Inc.; and "Insurance Proceeds" concerns monies to be received pursuant to an insurance policy issued by the National Union Fire Insurance Company of Pittsburgh, Pennsylvania ("National Union"). The term "Proceeds" is further defined as revenues from these sources, less a deduction for "all payments of 'commissions to National Airlines' up to $3,018,325.00," but with no *deduction* for "deferred income." Paragraph 1(S) (emphasis added).

Book Value, in turn, is defined with reference to Exhibit A of the Aircraft Agreement, which details the derivation of the sum of $15,614,551.79 as the Book Value of the aircraft portfolio. Book Value is a key term in the determination of the Distributable Proceeds and, therefore, in the determination of Armco's level of participation under the Aircraft Agreement. Armco's thirty-five percent share applies to revenues in excess of this sum. Book Value is explained in Exhibit A of the Aircraft Agreement ("Exhibit A") as follows:

> The Book Value as of December 31, 1984 was $14,142,399.79 (sic), determined as follows:

| | |
|---|---:|
| Receivable for twelve past due notes from ONAL to AFC | $15,694,187.00 |
| Accrued interest on the twelve past due notes | 669,107.32 |
| Prepaid premiums on the Insurance Policy | 1,519,036.47 |
| Commissions to National Airlines | (3,018,325.00) |
| Accrued legal expenses | (40,000.00) |
| Frontier Aircraft | 790,546.00 |
| | $15,614,551.79 |

Exhibit A to Aircraft Agreement.

Book Value is defined elsewhere as follows:

> (E) "Book Value" shall mean the net book value on AFC's books and records, after deducting all liabilities and/or reserves whatsoever relating to, the Avemco Claim, Frontier Aircraft and Insurance Transaction as of December 31, 1984 as included in the audited financial statements of AFC prepared and certified by Deloitte, Haskins & Sells, as adjusted, all as set forth in *Exhibit A* attached hereto and made a part hereof.

Aircraft Agreement at § 1(E).

The narrow dispute occasioned by the Complaint centers on the inconsistency between the Book Value figure recited in the preamble to Exhibit A, $14,142,399.79, and the Book Value figure explicitly derived, in a tabular calculation, immediately below

---

36. Two observations are made regarding the language contained in this provision. First, the language "at any time, and from time to time" is the kind of language which the parties, if they intended Armco's interpretation of the term "realized tax benefit," would and should have included in the Merger Agreement. Such language could have described a covenant by Glenfed to pay over to Armco the value of NOLs as they are utilized over time. Second, the language "pay or cause to be paid" suggests the parties' belief that "money is fungible." Although perhaps somewhat more obliquely, the suggestion is made that, in connection with the Commissions Motion (discussed below), the parties were capable of measuring the amount of commissions paid based upon the offsetting of other debts in addition to actual out of pocket cash payments of commissions.

the preamble, $15,614,551.79. It appears, as argued by Glenfed, that Armco brought Count IV of the action to contest a single question: which, of two figures on Exhibit A to the Aircraft Agreement, constitutes the actual Book Value figure to be used in calculating Distributable Proceeds? No other issue or theory was presented in Count IV of the Complaint. Armco's contention is as follows:

> *"Book Value" of $15,614,551.79 as set forth in tabular form in Exhibit A of the Aircraft Agreement is incorrect because it omits the sum of $1,472,152,* which should have been included as a deduction from book value for deferred income. Including the deduction for deferred income results in a correct book value as of December 31, 1984, of $14,-142,399.79, which is the correct result using the definition set forth in Section 1(E) of the Aircraft Agreement and in the line preceding the tabular presentation in Exhibit A. The $14,142,399.79 sum is the net book value on AFC's books and records as of December 31, 1984 and is the amount actually "paid" by Glenfed for purposes of determining the price paid for the purchase of the stock of AFC pursuant to the Merger Agreement.

Complaint ¶ 38 (emphasis added).

Armco clearly alleged that the correct Book Value figure is that set forth in the preamble to Exhibit A, which states the Book Value is $14,142,399.79. *Id.* Armco, therefore, contends that Glenfed, by paying Armco's share of the aircraft portfolio revenues on the basis of the higher Book Value figure of $15,614,551.79, has improperly deprived Armco of thirty-five percent of the difference between the two figures ($15,614,551.79 − $14,142,399.79 = $1,472,-152) or $515,253.20. *Id.,* ¶ 40.

The allegation in paragraph 38 of the Complaint notwithstanding,[37] the parties now appear to agree, at least on one level, how in the drafting process the discrepancy in Book Value amounts came into being. It appears "deferred income" was deleted from the signed and initialled final version of Exhibit A. It had been included as a deduction from Book Value on Exhibit A in previous drafts of the Aircraft Ageement.

Glenfed argues that, as part of the business deal, deferred income was intentionally omitted (as a deduction) in the tabular calculation of Book Value, but through inadvertance the parties failed to reflect the corresponding change in the preamble to Exhibit A. In preparing to close a document intensive transaction, such proofreading carelessness is perhaps understandable; it is quite hard to imagine, on the other hand, that the parties failed to pay considerable attention to the tabular presentation of the Book Value calculation, which is exactly where last minute changes were effected.

Concerning the discrete issue in the Deferred Income Motion of which number, $14,142,399.79 or $15,614,551.79 in Exhibit A, was the intended Book Value figure for purposes of determining "Distributable Proceeds," summary judgment is inappropriate. The resolution of a material fact dispute, even if relatively easy to make, is beyond the scope of summary judgment motions. If plaintiffs continued to assert that Book Value equalled the number in the preamble, and Glenfed urged the number as derived in the detail below, a triable issue of material fact—albeit a narrow one—would surely exist.

As it turns out, however, plaintiffs have sought to redefine the nature of the factual dispute in a way which, if accepted, gives rise to more factual complexity. Ironically, in their effort to redefine the factual in-

**37.** As discussed below, plaintiffs have now advanced a theory explaining the discrepancy which (1) seems inconsistent with their allegation contained in paragraph 38 of the Complaint and (2) would seem to require (before the theory could be considered relevant) a broader array of allegations in the Complaint. It is arguable that, based upon the content in the current Complaint, Armco's present theory, as it has evolved, would not be cognizable. To the extent Armco's position on the Deferred Income Motion depends upon an amendment to the Complaint, leave is granted to file such an amendment. For purposes of this motion, such amendment will be deemed to have occurred, and Armco will not be restricted to its original theory that the correct Book Value figure is set forth in the preamble to Exhibit A ($14 million).

quiry and marshall evidence to support their position, plaintiffs have conceded that the apparent issue of material fact concerning which of the two inconsistent numbers on Exhibit A was the true Book Value does not exist. In short, plaintiffs appear to concede that $15,614,551.79, the Book Value figure specifically derived in tabular form on Exhibit A, is the Book Value figure to be plugged into the sharing formula.

Plaintiffs have sought to redefine or refocus the issue of material fact. Whereas they previously took the position that Book Value was the $14 million figure in the preamble to Exhibit A, they now concede otherwise but claim the change in the Book Value figure was intended to be accompanied by a corresponding change, dollar for dollar, in the amount of Proceeds, as defined. Both changes appear to involve the concept of deferred income.

For the reasons that follow, it is concluded an evidentiary hearing is necessary to explore the interrelationships among, and reasons for, a number of drafting changes made to the Aircraft Agreement shortly before the closing.[38] Accordingly, the cross-motions on the Deferred Income issue are denied.

*$15,614,551.79 is the Undisputed Correct Book Value Figure*

As indicated, the parties affirmatively eliminated the Deferred Income deduction in the detailed calculation of Book Value, but failed to make the conforming change in the preamble to Exhibit A. Glenfed asserts the Armco representatives responsible for the Aircraft Agreement, Scott Beeken and Evan Smith, conceded in deposition testimony that the $15.6 million figure was the Book Value agreed to by the parties, and that the $14.1 million figure stated in the preamble was erroneous and would have been corrected had it been noticed at the closing. In addition, Glenfed places great emphasis on a document it calls a "smoking-gun" memorandum generated by one of plaintiff's agents,[39] which appears to support the conclusion that the correct Book Value figure was $15.6 million.

As noted, it cannot be reasonably disputed that Exhibit A to the Aircraft Agreement is ambiguous on its face. Furthermore, the ambiguity is material in that it involves the correctness of a dollar figure central to the sharing formula calculation. An issue arises as to how extrinsic evidence may be considered in resolving the ambiguity contained in Exhibit A. California law does not exclude extrinsic evidence offered to explain ambiguities and give meaning to contractual terms. *Hennefer v. Butcher*, 182 Cal.App.3d 492, 501, 227 Cal.Rptr. 318, 322 (1986), *review denied* (1986). Here, Glenfed argues, limited extrinsic evidence fully clarifies the facial ambiguity.

The parol evidence rule precludes the admission of extrinsic evidence only where the evidence concerns a prior or contemporaneous agreement and is offered to vary or contradict the terms of an integrated contract. *Id.* 227 Cal.Rptr. at 322. The test for the admissibility of extrinsic evidence under California law is "whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." *Pacific Gas & Electric Co. v. G.W. Thomas Drayage and Rigging Co.*, 69 Cal.2d 33, 37, 69 Cal.Rptr. 561, 564, 442 P.2d 641, 644 (1968); *Pacific Gas & Electric Co. v. Zuckerman*, 189 Cal.App.3d 1113, 234 Cal.Rptr. 630, 647 (1987).

Apart from the deposition testimony and the so-called "smoking gun" memorandum (which tend to corroborate the explanation

---

**38.** While extrinsic evidence will be considered in this regard, it is again noted that, in construing agreements, the straightforward language of the contract itself is highly probative.

**39.** In this "smoking gun" memorandum, Beeken explained in part:

From these amounts, a maximum payment of a little over $3 million in commissions must be deducted, *as well as the $15.6 million in book value* plus out-of-pocket costs *before the sharing percentage takes effect.*

In an effort to explain away the apparent content of this memorandum, Armco states that Beeken was not familiar with all aspects of the transaction.

that the Book Value figure in the preamble was a typographical error), Armco appears to now acknowledge that $15,614,551.79 *was* the agreed-upon Book Value on Exhibit A, and that $14,142,399.79 was a mere proofreading error. Plaintiffs' Third Brief, pp. 12, 20. Perhaps recognizing the difficulty in proving that which was asserted in paragraph 38,[40] plaintiffs have "switched gears," seeking to accomplish their original purpose by a presentation of how the last minute elimination of the deferred income deduction in Exhibit A was supposed to be accompanied by a corresponding dollar for dollar offsetting change elsewhere in the Aircraft Agreement. As discussed below, plaintiffs now seek to wage their "deferred income" battle on another front: the definition of includible Proceeds.

*Propriety of Plaintiffs' Suggestion that Other Provisions are now Subject to Special Interpretation*

Having established the discrepancy contained in Exhibit A was a typographical/proofreading error, Glenfed argues that the Aircraft Agreement is clear and the sharing formula straightforward. As far as Glenfed is concerned, the debate is closed; examination of other provisions is both unnecessary and inappropriate under the parole evidence rule.

According to Armco, however, the last minute elimination of the "deferred income" deduction from Book Value, as calculated on Exhibit A, was a change which Glenfed requested for technical accounting reasons, but which was never intended to alter the business deal, i.e., that Armco was intended to share in deferred income.[41] Armco argues Glenfed's failure to share deferred income with Armco involves a factual dispute over how the Aircraft Agreement was drafted and what its various terms were intended to mean.

At the time of the closing, $1,472,152 of deferred income remained on the books of AFC waiting to be brought into AFC's income stream. The source of deferred income depends, in essence, upon the residual values of assets in the aircraft portfolio which were the subject of lease agreements. As an "accrued liability," this remaining deferred income was subtracted from book value and reflected in all but the final draft of Exhibit A to the Aircraft Agreement generated during the negotiation period. Conceding that the discrepancy on Exhibit A is an error, Armco argues the discrepancy which makes Exhibit A facially ambiguous is only one of several contemporaneous changes to the Aircraft

---

40. In response to Glenfed's argument that Armco has backed off of its primary allegation—that the Book Value in Exhibit A equals $14 million—Armco has offered an answer which seems to skirt the issue. Armco now claims:

The Complaint alleges that Glenfed failed to account for deferred income as a reduction to book value—not the Aircraft Agreement's defined term *"Book Value"*—but the ordinary accounting convention of book value. Glenfed simply misreads the general usage of book value as a capitalized term that may have a more specific, defined meaning.... [W]hat constitutes the correct Book Value figure on Exhibit A to the Aircraft Agreement is not the only material issue in dispute.

Plaintiffs' Third Brief, p. 15–16 (emphasis in original text). Setting aside the failure to demonstrate their position with persuasive references to the Complaint, plaintiffs have not explained the reversal in their approach to the issues raised by paragraph 38. As indicated, however, the necessary amendments to the Complaint will be assumed for purposes of the Deferred Income Motion.

41. At his deposition, Beeken explained that Glenfed requested the removal of deferred income deduction in the Book Value calculation:
QUESTION: And what would have been the effect of the change that Glenfed was asking for?
ANSWER: Well, the way I understood it, what they had been proposing, it would be nothing more than maintaining the status quo, for cosmetic purposes; *for some reason that was never explained to us,* they wanted to change the way the numbers worked, but the idea would be that it would have no effect on the transaction.
Beeken Dep.Tr. at 101 (emphasis added).
It is noted that, if the issue is whether Armco was to share deferred income, it would seem relevant to consider closely Armco's somewhat unusual willingness to make Glenfed's last minute drafting changes—which "for some reason [were] never explained." The change on Exhibit A (removal of the deferred income deduction) was, in itself, far from cosmetic; it had the obvious effect of increasing Book Value and reducing Distributable Proceeds of which Armco was entitled to thirty-five percent.

Agreement which—taken as a whole—reflect the intent of the parties.

Armco reasons that, because the paramount consideration in the interpretation of a contract is the intention of parties as it existed at the time of contracting, it is the court's role to ascertain such intent when trying to give meaning to a contract's terms. (Citing *Western Camps, Inc. v. Riverway Ranch Enterprises, et al.,* 70 Cal.App.3d 714, 138 Cal.Rptr. 918 (Cal.Ct. App.1977); *Moss Development Co. v. Geary,* 41 Cal.App.3d 1, 115 Cal.Rptr. 736 (Cal.Ct.App.1974)). While Armco acknowledges the language of a contract is the best indicator of what the parties intended, *Western Camps,* 70 Cal.App.3d at 723, 138 Cal.Rptr. at 923; *Moss Development,* 41 Cal.App.3d at 9, 115 Cal.Rptr. at 741, it argues the ambiguity contained in Exhibit A justifies the court's examination of parol evidence.

In this connection, Armco suggests it is appropriate to scrutinize other defined terms in the contract with a view toward interpreting them based upon the changes to Exhibit A. Where the other terms appear to be unambiguous on a "stand alone basis," however, it is not clear that, under the parole evidence rule, a special gloss should be applied. *See Hennefer v. Butcher,* 182 Cal.App.3d 492, 227 Cal.Rptr. 318 (Cal.Ct.App.1986) (parol evidence which does not vary or contradict the written terms of a contract is admissible to explain ambiguities or give meaning and content to words used). The issue, then, is whether the other terms are sufficiently clear on their face. Armco argues that none of the parol evidence it presents tends to contradict the terms of the Aircraft Agreement; it simply explains the intent of the parties as to the operation of the Aircraft Agreement.

The parties appear to agree that multiple changes were made to the acquisition agreements shortly before the closing. Armco argues the changes were interrelated (the so-called "package of changes") and that, to the extent the new contract language does not make it clear what the parties' intent was on the deferred income

issue, the court should construe the changes in light of each other and with the added benefit of the substantial negotiating history. As set forth in Armco's brief, these changes were; (1) removal of a line item subtracting deferred income from the computation of Book Value on Exhibit A; (2) revision of the definition of Proceeds; and (3) the addition of § 11—"No Doubt [Double] Count."

### 1. Revision to Exhibit A.

As discussed above, and now conceded by Armco, a line item that subtracted $1,472,152 of deferred income from other items comprising Book Value, as calculated on Exhibit A, was removed. This increased the specifically derived Book Value on Exhibit A to $15,614,551.79.

### 2. Revision to Definition of Proceeds.

The definition of Proceeds at Section 1(S) of the Aircraft Agreement was revised from the preceding draft, with the addition of the underscored language below:

"Proceeds" shall mean Armco [Avemco] Proceeds, Frontier Proceeds or Insurance Proceeds, as the case may be. *For purposes of determining the Proceeds, it is agreed that all payments of "commissions to National Airlines" up to $3,018,325.00, including the crediting of such commissions against indebtedness of National to AFC, shall be deducted in connection with the calculation of such Proceeds, but that no deduction shall be made for "deferred income" in connection with such calculation.*

### 3. Addition of the No Doubt [Double] Count Provision.

The following provision was also added to the Agreement:

11. *No Doubt [Double] Count.* For the avoidance of doubt, the calculation of any amount hereunder shall be made so that no amount shall either be deducted more than once or added more than once.

A witness for Armco (their chief contract negotiator on this transaction) testified that the effect of the above "package of changes" was to remove deferred income from the direct computation of "Book Val-

ue," thereby increasing Book Value by the amount of deferred income, while at the same time *adding*[42] deferred income to "Proceeds." According to Armco,

> Since Book Value is subtracted from these proceeds in order to determine Distributable Proceeds, the net effect of increasing Book Value by the deferred income amount and correspondingly *increasing* Proceeds by the same amount is that Distributable Proceeds remains the same as if deferred income had never been removed as an accrued liability—a subtraction—against the assets listed on Exhibit A (*i.e.*, leaving the Book Value indicated on Exhibit A as $14,142,399.79 instead of $15,614,551.79).

Plaintiffs' Third Brief, p. 20.

Armco argues that "removing" deferred income from the computation of Book Value actually represents a "double negative" that increases Book Value by the deferred income amount of $1,472,152. According to Armco, this is because deferred income is an accrued liability which is subtracted from asset accounts to determine Book Value. If this subtraction is "removed," Book Value increases by the amount that otherwise would have been subtracted from the asset accounts.[43]

Armco's position on this issue requires further factual exploration. In the absence of precise contract provisions—making it clear that deferred income would be simultaneously removed as a deduction from Book Value and included as an addition to Proceeds—the Armco position takes on substance only if the Proceeds provision is found to be ambiguous and other evidence is considered.

The effect of the change to Exhibit A is clear: the deferred income deduction from the Book Value calculation is removed and Book Value is thereby increased. Plaintiffs' argument that Proceeds should be *increased* by a corresponding amount is based upon inclusion of the following language in the Proceeds definition:

> "but no *deduction* shall be made for deferred income[44] in connection with such calculation."

Armco appears to agree that the language is not explicit and is not self-enforcing. Insofar as Armco's construction is concerned, summary judgment is not available; the ambiguous language must be considered together with deposition testimony concerning the history of the negotiations and the motives of the parties.

Armco does not address Glenfed's argument that the language in the Proceeds definition is readily susceptible (without any gloss attached) to Glenfed's interpretation and that, as a counting matter, deferred income was never *deducted* from the Proceeds amount. Armco simply concludes, without compelling textual analysis of the key definitions, that Glenfed has double counted deferred income in its favor. It is flatly stated: "[I]n calculating the required distribution to make to Armco,

---

**42.** As discussed further below, however, the new language in the definition of Proceeds did not specifically require *additions* of deferred income to proceeds; it precluded *deductions.*

**43.** According to Armco, after the package of changes, deferred income was included as an

*addition* to both the Proceeds and the Book Value accounts. Accordingly, at all times the difference between these two accounts was a constant. This result is demonstrated graphically, with example numbers, by Armco:

| BEFORE PACKAGE | | AFTER PACKAGE | |
|---|---|---|---|
| Proceeds not including deferred income | $27,000,000 | Proceeds including deferred income ($27,000,000 + $1,472,152) | $28,472,152 |
| Book Value not including deferred income | $14,142,399 | Book value including deferred income ($14,142,399 + $1,472,152) | ($15,614,551) |
| Distributable Proceeds | $12,857,601 | Distributable Proceeds | $12,857,601 |

**44.** According to Glenfed, the insertion of this language would result in the addition of $1,472,-152 to Proceeds *only if* that deferred income

amount had previously been deducted from Proceeds. This would avoid a "double count."

Glenfed added deferred income to the Book Value portion of the formula, but refused to add it to the Proceeds portion." Plaintiffs' Third Brief, p. 23.

In short, the change made to Exhibit A makes it clear that deferred income was to be eliminated as a deduction to Book Value. As to Proceeds, the language does not appear to require—in any explicit fashion—Glenfed to add in deferred income. The double count aspect of this dispute is an elusive concept, the application of which seems to depend upon a predetermination as to which party (or perhaps both parties) was to enjoy the benefit of deferred income.[45]

Glenfed argues that even if there were some way that the "package of changes" included in the final draft of the Aircraft Agreement could be construed to produce an ambiguity in the sharing formula, the rules of contract interpretation would preclude such a construction. Ignoring the fact that it requested the change to Exhibit A, Glenfed argues that Armco's attorney, Evan Smith, drafted the "package of changes." Under California law, "[i]f uncertainty exists, the language of the contract is to be construed most strongly against the party who caused uncertainty to exist," *Nixdorf Computer, Inc. v. Jet Forwarding, Inc.*, 579 F.2d 1175, 1179 (9th Cir.1978), i.e., against the drafting party. *Union Bank v. Winnebago Industries, Inc.*, 528 F.2d 95, 99 (9th Cir.1975).

■ Glenfed makes two arguments: (1) it is a somewhat liberal application of the parol evidence rule to permit extensive extrinsic evidence to confer special meaning to the definition of Proceeds—a term not containing any facial ambiguities—merely because of an apparent proofreading error elsewhere in the Aircraft Agreement and (2) if any ambiguity is found to exist, it should be construed against the drafter. It is also recognized, on the other hand, that at least two of the changes in the so-called

package of changes—the elimination of the deferred income deduction in Exhibit A and the obscure prohibition against deductions from the Proceeds definition—appear to be interrelated. It may be more than a coincidence that late changes were made to the Aircraft Agreement involving treatment of deferred income. Because of the apparent relationship, summary judgment is denied.

### Estoppel

Glenfed also contends that Armco should be estopped from claiming an entitlement to money referred to in Count IV of the Complaint. Glenfed argues that its computation of Armco's share of aircraft portfolio revenues was adopted on more than one occasion by Armco or its agents. Glenfed states that on July 29, 1985, for example, Glenfed officials and Armco's Scott Beeken met to determine whether an outstanding insurance claim, the primary source of anticipated proceeds, should be settled on the terms offered by the insurance carrier.

At the July 1985 meeting, when Beeken was presented with Glenfed's computation of Armco's share of the Insurance Proceeds (as defined above), he apparently agreed that Glenfed's calculation matched Exhibit A. Beeken, it is asserted, further advised the Glenfed representatives that Armco would not exercise certain rights under the Aircraft Agreement arising in the case of a disagreement as to the amount of proceeds. In reliance on that fact, and believing that the division of Insurance Proceeds was agreed to by Armco, Glenfed argues it settled the insurance claim on the terms then offered by the carrier. In short, Glenfed contends that it believed there was no dispute with Armco in 1985 as to the amount of net revenue, after sharing, that the settlement would yield Glenfed.

Under California law,

a person [cannot] deny the existence of a state of facts if he or she intentionally

**45.** Armco further argues that the double count by Glenfed is easily recognized when one considers what Glenfed in fact paid for the Aircraft Portfolio—$14,142,399—its book value as of December 31, 1984. Armco argues that each of the representatives of Glenfed has stated in depositions that he is aware that Glenfed/Glendale paid $14,142,399 for the aircraft portfolio at closing.

led another to believe a particular circumstance to be true and to rely on this belief to his or her detriment. Equitable estoppel bars a claim when the party to be estopped is apprised of the facts, and intends that his or her conduct be acted on, or so acts that the party asserting the estoppel has a right to believe it was so intended; and when the party asserting estoppel is ignorant of the true state of facts, and relies on the conduct of the party to be estopped to his or her detriment.

*Islander Yachts, Inc. v. One Freeport 36' Vessel, #145,* 173 Cal.App.3d 1081, 1087–88, 219 Cal.Rptr. 654, 658 (1985). Glenfed argues Armco is now estopped from denying its assent to the sharing of proceeds, because it affirmatively led Glenfed to believe that there was no dispute as to the calculation of proceeds. Glenfed stresses Armco knew, or should have known, it was natural and probable that it would rely on Armco's apparent assent in determining whether to accept the insurance settlement.[46] Defendant's Third Brief, p. 21.

■ Having declined to decide as a contract matter whether Glenfed remitted the appropriate amount of Distributable Proceeds to Armco, it is now necessary to resolve whether Armco, because it allegedly induced Glenfed to settle the insurance claim (in reliance on Armco's indication there was no dispute), should now be estopped from arguing otherwise.

Armco argues it never assented to Glenfed's calculations. Instead, it is stated that Beeken was permitted merely a cursory look at a schedule of numbers, quickly placed in front of him, at the July 1985 meeting. Armco argues Beeken merely noted that the numbers matched the detail on Exhibit A. According to Armco, this does not rise to the level of assent and therefore cannot give rise to estoppel. Furthermore, Armco argues Glenfed did not rely on any Armco representations or actions. It is argued that Glenfed cannot demonstrate it would have acted any differently with respect to the insurance company offer absent Beeken's visit.

According to Armco, Beeken met with Glenfed personnel in July 1985 not to decide whether Glenfed should accept the insurance company's offer, but to decide whether Armco would "buy-out" Glenfed's position in the transaction pursuant the Aircraft Agreement. Armco argues that (1) Glenfed's share (as a percentage) of a proposed settlement would be the same regardless of which option it pursued and that (2) Armco's position with respect to sharing deferred income could therefore not have influenced Glenfed's decision to accept or reject the settlement offer. This argument ignores the possibility that Glenfed depended on achieving a minimum investment return measured in absolute dollars quite apart from sharing percentages.

Armco also argues that it did not intentionally mislead Glenfed. Without citing to any authorities, Armco suggests the conduct of the party to be estoped must be intentional. In support of their factual argument that Beeken's actions were not intentional, Armco argues the knowledge which Beeken relied upon when he reviewed the offer of settlement was mistaken.

Glenfed appears to acknowledge that the various elements which are required before estoppel will be applied are fact intensive.[47] It nonetheless believes summary judgment is appropriate on the estoppel issue. On

---

**46.** On the issue whether Armco could have anticipated Glenfed would rely on Beeken's actions, Glenfed notes the entire purpose of the July 29 meeting was for both sides to arrive at decisions regarding the insurance company offer.

**47.** Glenfed summarizes Armco's arguments as follows: (1) Beeken's approval of the figures did not constitute assent, (2) Glenfed did not rely on Armco's actions, and (3) Armco did not intentionally mislead Glenfed. Glenfed argues that "the first two arguments are *factually incorrect.*" As to the third argument, Glenfed argues "the precedents establish that intentionally misleading conduct is not a prerequisite to estoppel." Defendant's Fourth Brief, p. 23. The party to be estopped need only "so act[ ] that the party asserting estoppel is ignorant of the true state of facts, and relies. . . ." *Islander Yachts, Inc. v. One Freeport 36' Vessel, #145, supra,* 219 Cal. Rptr. at 658.

the issue of assent, Glenfed emphasizes Beeken did not testify that at the July, 1985 meeting he "was given a cursory look at a schedule of numbers quickly placed in front of him. According to Glenfed, Beeken's review of the schedule may have been "cursory," but he gave no indication at his deposition that Glenfed officials rushed his review.

While Glenfed argues that Armco's effort to create a genuine issue of material fact (on the issue of Beeken's satisfaction that the formula had been complied with) is questionable at best, it appears that an issue of fact nonetheless exists as to the nature of Beeken's assent. Armco argues that Beeken went to the July 1985 meeting to decide whether to "buy-out" Glenfed's position, not to approve the insurance settlement. If this is so, the next question is obvious: did Beeken not go to that meeting with a larger perspective of the context in which the meeting took place? Likewise on the issue of reliance, it is possible Glenfed's willingness to settle the insurance claim depended on Armco's apparent agreement on the sharing formula issues. According to Glenfed, it relied upon Beeken's representation that the sharing computation was undisputed, and accepted the insurance offer based on its anticipated profitability. This involves, however, an issue of fact. In conclusion, because this issue deserves further factual exploration, summary judgment is denied.

### Accord and Satisfaction

■ After receiving certain Insurance Proceeds, Glenfed indicates that it sent a letter to Armco stating, among other things, the following:

Gentlemen:

Pursuant to Section 2 of the Aircraft Agreement dated as of April 10, 1985, this is to advise you that we have received $17,379,463.00 in Insurance Proceeds from National Union, calculated as follows:

| | |
|---|---|
| Gross Amount from Insurance Company | $20,437,788 |
| Less: Legal Expenses | 40,000 |

| | |
|---|---|
| Amounts due ONAL and National | $ 3,018,325 |

| | |
|---|---|
| Insurance Proceeds per (1)M of Aircraft Agreement | $17,379,643 |

Accordingly, the amount of Distributable Proceeds due Armco is $617,718.92, calculated as follows:

| | |
|---|---|
| Insurance Proceeds | $17,379,463.00 |
| Less Book Value | $15,614,551.79 |

| | |
|---|---|
| Distributable Proceeds per (1)H of Aircraft Agreement | 1,764,911.21 |
| Armco's Sharing Percentage | × 35% |

| | |
|---|---|
| Additional Purchase Price per Section 2 of Aircraft Agreement | $617,718.92 |

*Id.* In addition, Glenfed sent Armco a check for $617,718.92. Glenfed maintains the language of the letter made clear the check was intended to be in full satisfaction of Glenfed's obligation to Armco with respect to the insurance claim.[48] In addition, Glenfed states Armco deposited the check on October 2, 1985 without any indication of objection to the amount of the payment.

The rule with respect to accord and satisfaction has been articulated as follows:

[W]here a claim is disputed or unliquidated and the tender of a check or draft in settlement thereof is of such character as to *give the creditor notice that it must be accepted "in full discharge of his claim" or not at all*, the retention and use of such check or draft constitute an accord and satisfaction; and it is immaterial that the "creditor protests against accepting the tender in full payment," for in such case "the law permits but two alternatives, either reject or accept in accordance with condition."

*Potter v. Pacific Coast Lumber Co.,* 37 Cal.2d 592, 597, 234 P.2d 16, 18 (1951) (citations omitted) (emphasis added).

Armco argues that an accord and satisfaction cannot be reached unless the tendering party notifies the other party in "express terms" or by an "explicit state-

---

**48.** Glenfed concluded the letter as follows:

This is the amount agreed to with Scott Beeken in Dallas on July 29, 1985, when he was reviewing the Residual Value Policy offer. If you need any additional information, please call me or any of the people here who have been handling the matter.

*Id.*

ment." *Biaggi v. Sawyer,* 75 Cal.App.2d 105, 170 P.2d 678, 683 (Cal.Ct.App.1946); *accord Angle v. U.S. Fidelity & Guaranty Co.,* 201 Cal.App.2d 758, 20 Cal.Rptr. 391 (Cal.Ct.App.1962). In *Potter,* the Court reasoned that a "debtor must make clear that the acceptance of what he tenders is subject to the condition that it shall be in full satisfaction...." 234 P.2d at 19. The Court went on to note that "[i]n order that the acceptance of the check or remittance shall operate as a full discharge, the condition that it is to be accepted in full satisfaction of the pending claim or obligations must be expressly made...." *Id.* 234 P.2d at 24 (Carter, J., dissenting).

The Court explained:

It is an essential element of accord and satisfaction by tender of a check, that the tender is subject to the condition that the acceptance of the check is satisfaction in full. *This condition is not shown by the mere fact that the debtor accompanies the check with an account showing a balance equal to the amount of the check,* and it is disproved where the giving and acceptance or the check is followed by such conduct of both parties as clearly shows that they did not consider the check a final settlement of the debt.

*Id.* 234 P.2d at 25 (citation omitted) (emphasis added). *See also Besco Enterprises, Inc. v. Carole, Inc.,* 274 Cal.App.2d 42, 78 Cal.Rptr. 645, 646 (1969) (letter accompanying check states that check is in full payment of claim).

By way of analogy, although it appears the statute was not in existence at the time the Aircraft Agreement was signed, California recently enacted the following provision as an addition to its Civil Code:

Check or Draft Tendered in Full Discharge of Claim; Acceptance; Protest; Composition or Extension Agreement Between Debtor and Creditors; Release of Claim

(a) Where a claim is disputed or unliquidated and a check or draft is tendered by the debtor in settlement thereof in full discharge of the claim, and the words "payment in full" or other words of similar meaning are notated on the check or draft, the acceptance of the check or draft does not constitute an accord and satisfaction if the creditor protests against accepting the tender in full payment by striking out or otherwise deleting that notation or if the acceptance of the check or draft was inadvertent or without knowledge of the notation.

. . . .

A creditor shall be conclusively presumed to have knowledge by the restriction if a creditor either:

(1) Has, previous to the receipt of the check or draft, executed a written consent to the composition or extension agreement.

(2) Has been given, not less than 15 days nor more than 90 days prior to receipt of the check or draft, notice, in writing, that a check or draft will be tendered with a restrictive endorsement and that acceptance and cashing of the check or draft will constitute an accord and satisfaction.

Calif. Civil Code § 1526 (1987).

Glenfed's argument that it is entitled to summary judgment on the deferred income issue because of the doctrine of accord and satisfaction is denied. The factual record (which includes a lack of clear notice to Armco), as it currently exists, does not support entry of summary judgment.

*Unilateral Mistake*

 In significant part conceding the language contained in the Aircraft Agreement—particularly the so-called package of changes drafted at the last minute by plaintiffs' counsel—does not explicitly support their position on the deferred income issue, Armco argues in the alternative that the court should grant it summary judgment under the doctrine of unilateral mistake. For the following reasons, however, Armco's efforts to seek a judicial redrafting of the Aircraft Agreement in the context of a summary judgment must be denied.

A unilateral mistake will make a contract voidable only where "(a) the effect of the

mistake is such that enforcement of the contract would be unconscionable,[49] or (b) the other party had reason to know of the mistake or his fault caused the mistake." Restatement (Second) of Contracts § 153 (1981). The Restatement of Contracts states that:

> [I]f one party at the time of the execution of a written instrument knows not only that the writing does not accurately express the intention of the other party as to the terms to be embodies therein, but knows what that intention is, the latter can have the writing reformed so that it will express the intention.

Restatement Contracts § 505 [50] (emphasis added).

In response to Armco's contention that Glenfed had reason to know of a mistake by Armco—which Armco attempts to support by referring to the testimony of an *AFC* official who stayed on with Glenfed— Glenfed points out that for the unilateral mistake doctrine to apply, Glenfed would have to have had reason to know of the mistake at the time the contract was executed. Restatement (Second) of Contracts, § 153. The AFC official, Michale Burks, indicated that, upon reviewing the Aircraft Agreement after the closing, he felt the plaintiffs may not have correctly documented their goals concerning the deferred income issue. He had concluded the drafting change in the Proceeds definition was, on its face, meaningless.

Burks was not present at the closing and only acquired his feeling about Armco's intent when he saw the documents weeks after the closing. Glenfed argues that apart from Burks' impressions, there is no evidence in the record that anyone from Glendale or Glenfed had reason to believe that Armco had made a mistake in agreeing to the changes included on the final draft. Glenfed emphasizes that Armco's attorney, Evan Smith, had drafted those changes.

It is further observed that Burks, who was an employee of the business being acquired, was really not a principal to (he was, in a sense, the object of) the acquisition transaction. Accordingly, although there may exist factual issues as to his allegiances, plaintiffs have failed at this stage to demonstrate that the acquirer of the AFC assets knew of the alleged false premises of Armco.

On the issue of the true business deal, moreover, it is not clear that deferred income was intended to be split between the parties. *See Gardner v. Mobil Oil Co.*, 217 Cal.App.2d 220, 31 Cal.Rptr. 731, 733 (1963) ("the rule [is] that the reformation of a plan and unambiguous provision in a written agreement must be supported by *clear and convincing evidence* "). For this additional reason, summary judgment on the grounds of mistake is not appropriate at this time. The current existence of an issue of fact in this regard precludes summary judgment.

### III. Commissions Motion

As a third and final pending motion, Armco has moved for summary judgment on an issue which relates to the definition of Proceeds, but which is distinct from the deferred income issue discussed above. As indicated, pursuant to the Aircraft Agreement, Glenfed was to share several million dollars of "Proceeds" with Armco, net of certain specific deductions. One of these

---

**49.** There has been no suggestion by plaintiffs that enforcement of the language in the Aircraft Agreement against them would be unconscionable.

**50.** § 153 of the Restatement further states:
> Where a mistake of one party at the time a contract was made as to a basic assumption on which he made the contract has a material effect on the agreed exchange of performances that is adverse to him, the contract is voidable by him if ... the other party had reason to know of the mistake or his fault caused the mistake.

Restatement (Second) Contracts § 153 (emphasis added); *see also Schultz v. County of Contra Costa,* 157 Cal.App.3d 242, 203 Cal.Rptr. 760 at 765 (1984). As to mutual mistake of the parties, a comment to Restatement (Second) of Contracts § 152 notes:
> Where a mistake of both *parties at the time a contract was made as to a basic assumption* on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party. (emphasis added)

*Id.,* comment c. at 387–388.

agreed-upon deductions from Proceeds was commissions paid to a third party, National Airlines, Inc. ("National Airlines"). Armco argues that, although Glenfed deducted from Proceeds the full amount ($3,018,325) of all commissions which Glenfed could possibly owe to National Airlines, Glenfed in fact did not pay any of these commissions to National Airlines. Armco claims that, as a result of Glenfed's breach, it has wrongfully been denied payments in excess of $1 million.

The entire text of the Proceeds definition is set forth above; for purpose of analyzing Armco's present motion, the following portion of the definition is set forth again:

> For purposes of determining the Proceeds, it is agreed that all payments of "commissions to National Airlines" up to of [sic] $3,018,325.00, *including the crediting of such commissions against indebtedness of National to AFC,* shall be deducted in connection with the calculation of such Proceeds.

According to Armco, rather than affirmatively pay the $3 million to National Airlines for the commissions, Glenfed applied various portions of the $3 million to debts of National Airlines totally unrelated to the Aircraft Agreement transaction, to debts of a company affiliated with National Airlines and to debts of National to another party that is not affiliated with Glenfed or National. The Aircraft Agreement, however, does not explicitly require that the indebtedness against which commissions are credited must be related to the Aircraft Agreement; it is indicated that the debts must be National's to AFC, with no mention of whether *affiliates* should be considered one and the same with either party. The key business point appears to be that the Proceeds would only be reduced by commissions paid, no particular method of payment having been required.

According to Armco, Glenfed purported to make the following reductions in National Airlines debt, in lieu of making affirmative payments to National for commissions which were due.

1. $543,132.64 attributed to a National Airlines debt to Glenfed arising from a Restated Loan and Security Agreement dated January 10, 1983.

2. $56,347.82 attributed to a National Airlines debt to Glenfed arising from lease payments and purchase option payments for navigation equipment subject to a certain Lease Agreement dated June 9, 1981.

3. $2,418,845 attributed to a National Airlines debt to Citicorp.

Plaintiffs' Brief, p. 6. As to the first two reductions, which appear to involve indebtedness of National Airlines to Glenfed (the successor to AFC), it appears the transactions giving rise to indebtedness were unrelated to the transactions concerning the Aircraft Agreement. As to the third reduction, Armco does not know if this transaction is related to the transactions concerning the Aircraft Agreement. While the above amounts have been set forth in Armco's brief, Armco admits that there may exist disputed fact issues.[51] This alone precludes summary judgment. The information supplied in connection with the Commissions Motion is sparse at best. The lack of available information concerning the nature of the indebtedness (to whom, by whom and for what reasons) underscores the need for further factual development.

Armco nevertheless believes it is entitled to summary judgment based upon the language of the Aircraft Agreement which, it asserts, unambiguously prohibits a deduction from Proceeds for commissions not actually paid by Glenfed in connection with collections on the aircraft portfolio. For the following additional reasons, plaintiffs' motion is denied.

Plaintiffs first argue that the Aircraft Agreement's definition of Proceeds requires "netting out amounts used to satisfy other National Airlines indebtedness." Plaintiffs' Fourth Brief, p. 9. In this re-

---

**51.** It was stated that "if there are any disputed facts with respect to these transactions it is whether Glenfed even made these reductions and/or whether Glenfed ever made a payment of $2,418,845 to Citicorp." Plaintiffs' Fourth Brief, p. 7.

gard, it is asserted that the Aircraft Agreement "clearly instructs Glenfed to credit *against* such commissions amounts not given to National Airlines as a result of the indebtedness of National Airlines to Glenfed." Plaintiffs' Brief at 10 (emphasis added). Armco has injected extra words to support its interpretation. The word *against*—which perhaps connotes the notion of setting-off or netting out—is *not* contained in the definition of Proceeds.

Armco argues when the definition of Proceeds is construed as a whole,[52] it becomes clear Glenfed miscalculated Proceeds. The definition of Proceeds was changed by the parties shortly before execution to reflect that the commission amount could be a figure *up to* $3,018,325, rather than exactly $3,018,325 as provided for in prior drafts of the Aircraft Agreement. According to Armco, the parties anticipated that, as a result of crediting National indebtedness, the actual amount of commissions to be deducted from Proceeds might be less than the specified maximum of $3,018,325. Finally, plaintiffs argue that the approximately $600,000 of National Airlines indebtedness to Glenfed (and possibly the $2.4 million to Citicorp) is entirely unrelated to the transactions addressed by the Aircraft Agreement and was not paid for by Glenfed as part of its purchase of the aircraft portfolio. Noting that the intent of the Aircraft Agreement was to provide a mechanism whereby the parties would share in the net gain on the disposition of the aircraft portfolio over the costs of the Portfolio to Glenfed, Armco objects to the fact that Glenfed would have reduced the gain to be shared by the parties on the Aircraft Portfolio by $600,000 even though those transactions had nothing to do with the aircraft portfolio.

The language in the Proceeds definition, however, as it relates to commissions, is reconcilable with Glenfed's treatment of Proceeds. The language "all payments of commissions ..., including the crediting of such commissions against indebtedness of National" can be read as follows: the crediting of commissions against indebtedness of National to AFC—whatever indebtedness—is simply one of many forms of payments (and the contract refers to "all payments").

The business issue appears to be whether Glenfed incurred commissions in connection with collecting on the insurance policy. The contract language which, although not completely clear on the issue, appears to support Glenfed's interpretation that the commissions deduction is proper so long as Glenfed incurred this cost, either by actually paying out that amount or by making a corresponding reduction in monies payable to AFC (now Glenfed) by National. Armco's motion for summary judgment on the language of the contract must be denied.

SO ORDERED.

---

**52.** A rule of contract interpretation is that language in a contract must be construed in the context of that instrument as a whole. *Producers Dairy Delivering Co., Inc. v. Sentry Ins. Co.,* 41 Cal.3d 903, 916 n. 7, 226 Cal.Rptr. 558, 565, 718 P.2d 920 (1986).